I call the next case, Rema v. United States Environmental Protection Agency, packet number 121022. Mr. Bumpers? Good morning, Your Honors. Good morning. May it please the Court, William Bumpers on behalf of Genon. With your permission, I'd like to reserve two minutes for rebuttal. Yes, sir. Your Honor, we're here today because EPA has tried to utilize Section 126 of the Clean Air Act to circumvent and express prohibition on their authority under Section 110 of the Clean Air Act. I'd like to lay out three points that I want to cover today. Under the Clean Air Act, Congress has been very express in its allocation of authorities and duties, and Section 110 is the quintessential example of this. EPA is given the authority to set the Clean Air Act standards across the nation. Thereafter, the states are given the express primary and exclusive authority to develop the regulations that will lead their sources to achieve those standards. Number two, Congress expressly limited EPA's authority to act if and only if, under that well-laid-out scheme of Section 110, the states fail to achieve their obligations. And number three, Section 126 was adopted as a backstop to that process, not as a primary remediation mechanism, but as a backstop when the states fail to act on that. It seems like Congress has also said that it is better, perhaps more efficient for the state that is on the receding end, the downwind state, to enforce violations of the Clean Air Act than the state where the harm is coming from. I don't believe Congress ever said that. I think what Congress said was, we're going to enact Section 126 so that the states who are on the receding end, if the upwind state has violated its obligation under 110, to prompt action by EPA. There are mechanisms that a downwind state can bring if there are violations. And indeed, in the legislative history of Section 126, Congress made it clear that this was an alternative, for example, to the citizen action provision of Section 304. But that 304 action can only come after there's been a violation, which means... How can you read the language of Section 126? This is, in quotes, violation of the prohibition of 110, A2D1, July, end quote, to refer to 110's requirement that SIPs provide adequate measures to prevent impermissible transboundary pollutions. 110's requirement contains a prohibition, but the requirement itself is not a prohibition. Well, Section 110 requires the states to develop regulations that establish that prohibition. But both EPA and the courts and Congress said that until and unless the states have acted in pursuance of the timetable and the schedule set forth in 110, that prohibition can't exist. And so, as of today, EPA, under Section 110, has no authority to act. Sounds like it takes all the teeth out of Section 126. I don't think it does at all, Your Honor. If you think about the structure of Section 110, it sets forth the clear process in which the states are supposed to develop the regulations to protect air quality, in their states as well as in transboundary states. Practically speaking, you could have a very serious problem, as you have here with the sodium dioxide, I guess it's called. Sulfur dioxide, yes, Your Honor. I'm sorry? It's sulfide. Sulfide. You could have that causing, as is noted here, very serious respiratory problems, emergency visits, hospital visits. You can have that going on and on and on, and what you are basically arguing is that the EPA can do nothing until the state from which the harm comes has enacted an SIP. But that seems to be totally contrary to the purpose of the Clean Air Act. Well, I just respectfully disagree, Your Honor. Section 110 sets up the very process that Congress intended for the states and EPA to follow. I mean, it could not be clearer. And what EPA is saying is, even though under 110 I have no authority to come in and preempt this process and exercise my authority in this ancillary provision, 126, somehow that gives me this authority to come in, parachute in, and ignore the limitation on my authority in 110. If this is an ancillary provision, why was it not a sub-provision of 110? It's a very good question, Your Honor. In fact, Section 110A2D, the section that imposes on the states the obligation to avoid the interstate transfer of pollutant, and 126 were enacted at the exact same time. As 110. No, as 110 and 126. So Congress went to the effort to say, okay, states, you have this obligation to prohibit emissions from affecting downwind states. And doing that is an integral part of Section 110, which is in accordance with the timetable and the obligations and the submittals in 110. Why would then Congress at the same time, if you interpret EPA, believe EPA's interpretation, impose 126 with this broad authority that would have made that entire amendment completely superfluous? Completely superfluous. And the answer is, they wouldn't and they didn't. Here's a statement that Congress made. I thought you disagreed or you said Congress didn't say that. An effective program must not rely on prevention or abatement action by the state in which the source of the pollution is located, but rather by the state or residents of the state which receives the pollution and the harm and thus which has the incentive and need to act. That's completely correct, Your Honor. But keep in mind, 126 is a remedial act that spurs EPA to act once the upwind state has failed in its duty. You know, if you look at the case law, the seminal case that they cite and we cite is Appalachian Power. In that case, the standard that was at issue was a 20-year-old standard. The states had had two decades to act and EPA had acted actually under Section 110 and said, these steps are inadequate, these plans are inadequate. And at that point, we completely agree, once the states have had their opportunity to address the problem and fail, 126 is an appropriate remedy. In that case, what happens when the upwind state's violation of the requirements, in this case that 1% requirement, prevent the downwind state from complying with its own SIP? Well, the sequence avoids that, Your Honor. I mean, it's important to keep in mind that this one-hour SO2 standard was enacted in August of 2010 and New Jersey filed this petition almost immediately in September. And EPA then acted on it within 15 months. When, and Section 110 is very clear, upon the revision or establishment of a standard, the states have three years to develop the regulations and submit it to EPA. But in response to what Judge Fuente said, the downwind state has no remedy, right? For quite some time. That's really not correct, Your Honor. The remedy is that New Jersey, as with Pennsylvania, have to develop their regulations and submit them for approval at EPA. New Jersey has done that. Well, they haven't yet. New Jersey and Pennsylvania both have to submit their plans in June of this year. If Pennsylvania submits a plan in June and it is inadequate and EPA rules that it's inadequate, that's when the 126 petition may be filed. But again, though, you're going to have to wait quite some time to get relief. I mean, you know, we may go back and forth about how harmful it is. Let's assume it's an incredibly harmful, something that's spewing out poisons that will cause direct injury immediately. We all have to wait all that time to get some sort of remedy? Well, Your Honor, the schedule is set out by Congress. And in this case, this is a one-hour SO2 standard. There already has been a three-hour SO2 standard, 24 SO2 standard. And all of this is set out in the process. And the question is, would Congress have given this incredibly rigorous and draconian remedy under 126 that applies only to a downwind state, but it wouldn't apply to residents within Pennsylvania? Within Pennsylvania, they have to submit their plan that will protect the air quality locally as well as the transport. Why would Congress say, we're going to give this super preference, we're going to act within 60 days and shut a plant down within 90 days under 126, when Congress said, here's the process we're going to go about to develop plans to meet the ambient air quality standards. A very orderly process. And the answer is, you get that kind of draconian result because there has been a failure up front. We've given Pennsylvania time to develop their plan. They failed. And as a result, we're now going to avail ourselves of this very aggressive remedy, which is shut the plant down. The EPA disagrees with your interpretation, does it? Yes, they do. Now, should they be given deference? I think not, Your Honor. They're interpreting regulations that they have to enforce. I think not for several reasons, if I can. Essentially, they're saying this creates a, quote, functional prohibition, which allows them to circumvent and express prohibition in Section 110. But let me just, two quotes from EPA. In 1999, when EPA promulgated another rule that was a transport rule, they were discussing Section 126. And this is in the rule. EPA says, It would be difficult to conclude that an affected source in the upwind state emits in violation of the prohibition that the SIP is not yet required to contain. And a little later in that same rule, they say, Sources emit in violation of the prohibition of 110A2D only where the SIP, their submission, or a federal plan fails to bar the excessive emission of the transported pollutants. We agree with that. It is if the existing plan fails to protect the downwind state, or if the state fails to promulgate a plan that protects the downwind state. So what exactly is your argument as to why we shouldn't defer to the EPA's Portland rule? Two reasons. One is, and it may be my favorite quote in all of the research, is the Supreme Court says, Congress does not upset well-established regulatory schemes by reference to vague and ancillary provisions. Or they don't hide the elephant in the mouse hole. And that's the Whitman v. American Trucking. I think if you read Section 129 or 126 directly, that prohibition depends wholly on the state having acted or failed to act in Section 110. So just reading it on its face, you have to assume that Congress did something. What if we assume it's ambiguous? Does that take us into Chevron? Well, I think if you conclude it's ambiguous, it does take us to Step 2. And there you've got replete legislative history and EPA's own interpretation, which is inconsistent with the position they're taking now. Well, the question for us is whether or not at Step 1, 126, is clear. Right? Correct. That's Step 1. If it's clear, we don't go to Step 2. That's true, unless you think it's clear for us. But yes, then if it's ambiguous, our view is it's very clear that we prevail. 126 does make reference back to 110, doesn't it? It depends entirely on 110 for its authority. So unless you find a violation in 110, 126 never comes into play. And you can't have that violation until there's a failure. We'll get you back on rebuttal. Thanks, Your Honor. Mr. Sibley? May it please the Court, George Sibley for the Intervenor Petitioner Utility Air Regulatory Group. I'd like to start with some of the questions with Judge Fuentes, one of the questions that you raised concerning the timing and why you should go through the Section 110 process. Every time EPA enacts a new air quality standard, every time EPA ratchets down the amount that's allowed for a given pollutant, in this case sulfur dioxide, you have, under the logic of Section 110, the very real prospect that you will have an interstate transport issue. And Section 110 A2D, the interstate transport provision that we're talking about, requires the upwind state to take action. Now, as Mr. Bunkers explained, that process, that SIP, we call it a SIP, the Implementation Plan Development Process, takes time. There are a number of considerations that all states have to take into account. Remember, the Clean Air Act is about improving air quality, but it's also about balancing those improvements with economic growth and development. And there are tough choices that each state has to make, and it takes time to make those decisions. Now, in the case of this particular standard, these states still have not submitted their plan. Pennsylvania, we fully expect, will incorporate limits into its SIP that will achieve the same, or functionally the same, reductions. There may be a dispute about the timetable, but they will do their job, and Pennsylvania has historically done their job. As I understand the record, Pennsylvania supports the use of 126 in this case. Well, I think that overstates it. Pennsylvania has acquiesced in what has happened here, but that does not make EPA's action any more justifiable. It hasn't intervened, it agreed the Portland Rule was an appropriate way to address Portland's downward emissions. That is a fair characterization of the record. If you're looking for Pennsylvania to help you, I'm not so sure you're going to. Well, certainly Pennsylvania has not intervened, but that does not make EPA's action any more legal. And I would suggest that what this situation invites is implementation of these requirements through litigation. How do you respond to EPA's argument that it can proceed with 126? It's not bound by any language in 110. Well, I think it is bound by language in 126, and we would point to two aspects of 126. Of course, that takes us to the Chevron issue and whether we should give their interpretation of 126. Let me address your first question first, Judge Fuentes. With respect to Section 126, Section 126 expressly references Section 110, and that is significant, and it's significant for this reason. The statute does not say what constitutes a significant contribution to nonattainment. There's no provision in the statute that says 1% or 2% of the standard equals nonattainment. Instead, that determination is made through a legislative rulemaking process. In this case, the states will go through that process and try and figure out exactly how much they need to abate to satisfy it. EPA will look at that and decide that's right or no, that's not right. And with respect to regional pollutants, not local sulfur dioxide, but with respect to other pollutants, which would be governed just by the same rationale that EPA applies in this case, that determination can be incredibly complex. It takes time. Right now, we don't know what is a significant contribution to nonattainment, and let me suggest further that that determination requires consideration of a host of factors that EPA has not considered in this case. Is it your position that the use of 126 must always await, no matter how long, a state's implementation, adoption, and approval of a state SIP, I guess? Let me give you a qualified yes to that. Not no matter how long. There are time limits in the statute. The EPA gets to set the time for states to submit implementation plans. They have a maximum of three years. They can set time limits less than that. If a state does not act within that time period, they would be in default of their obligation. We all agree that if Pennsylvania had failed to act, had not done what they were supposed to do, that 126 would be entirely appropriate. Pennsylvania has not had a chance to act, though. If this court allows this reading to go forward, and this is unprecedented, by the way. This has never happened. If this court adopts this view, you will invite a situation where one state will file a preemptive 126 petition. Wait a second. There have been many views that have said that 126 is independent of 110. Many courts have said that. I would disagree with that. It is independent with respect to 110. Do you disagree with that? Do you disagree with the proposition, or do you disagree that other courts have said that? I disagree with the proposition. Those other courts, in particular the Appalachian Power Court, which I think is the court that says that most clearly, they're referring to the 110k5, what we call the SIP call process, where EPA can tell a state, you need to go fix your SIP because it's wrong. There's an inadequacy. In that case, the state's in default. It has not done its job. It's not abating the interstate transport of pollutants. And that's a problem. And we all agree that in those circumstances, under the logic of Appalachian Power, that EPA can act. Here we have EPA using 126 as an alternative to 110a. And that is a very, very big difference. We have to finish up. We do. Thank you very much. Thank you very much. Ms. Peeples? Good morning, Your Honors. May it please the Court. My name is Timoni Peeples, and I'm here today on behalf of the EPA respondents in this matter. With me at counsel's table is Stephanie Hogan from EPA. Your Honors, I will take 10 minutes, and Ruth Macedo from New Jersey will take three minutes. Zachary Fabish from Greenpeace Clean Air Council and Sierra Club will take two minutes. The Portland Rule challenge here imposes sulfur dioxide, or what I refer to as SO2, limits at a single source in Pennsylvania, and that's based on EPA's undisputed finding that emissions from that source alone cause violations of the SO2 NAAQS in New Jersey. Now, petitioners claim that EPA's action is unlawful and premature because the violation of the prohibition of Section 110a2d1, referred to in Section 126b, can only exist after a SIP deadline has passed. EPA's rule should be upheld, however, because EPA has reasonably interpreted Section 126 to refer to the substantive functional prohibition on excessive interstate pollution that's found in Section 110a2d1, also called the Good Neighbor Provision. This interpretation gives effect to the express terms of Section 26 in light of the legislative history and statutory context. Nevertheless, if there is ambiguity, this court must defer to EPA's interpretation as long as it is reasonable. How do you respond to the argument that this Portland Rule is turning Rule 126 into a first resort type of action to implement the air quality standards? Well, let me be clear. EPA is not trying to implement the NAAQS through this rule. What EPA is doing is trying to give effect to the clear and express terms of Section 126b, which allows it to impose federal controls on sources once a finding has been made. But isn't that one of the purposes of your, of the 126, the use of this petition process, which is, in fact, to enforce air quality standards? It is to... To allow New Jersey to improve its own, or to, I guess, comply with its own quality standards? Yes, but it allows EPA to impose emission limits and compliance schedules on a source or a group of sources. It does not affect the state's discretion under Section 110 to develop a NAAQS with respect to the sources within its state borders. This applies to only one source. And here, that one source is causing nonattainment problems in New Jersey. So it's entirely reasonable for EPA to impose federal regulations on that one source. And Appalachian Power supports you on that proposition, right? Yes, it does. In that case, the court went through a very thorough analysis of Section 126 and 110 and the legislative history and determined that 126 is unusual in the Title I of the Clean Air Act, but that it expressly allows the federal government to come in and impose emission limits on sources. And that that does not affect the state's discretion under Section 110 to go beyond that and develop itself with respect to all the other sources in the state. Is it your contention that Section 126 is ambiguous? You tend to collapse the two-pronged Chevron test in your brief and discuss the reasonableness of your interpretation of 126. What is your position as to 126? Is it clear on its face or is it ambiguous? And it's interpreted. Our position is that 126 on its face does not impose any of the limitations that are urged by petitioners. We believe that our interpretation gives effect to the clear text of Section 126B, also in light of the statutory context. Read the interpretation out. Is it clear or are the words clear? Is the meaning plain? Yes, but if there is ambiguity, then we believe our interpretation is reasonable and the court must defer to it. You have a fallback position. But the point in answer to the question is that 126 is not linked to 110. You can go ahead and start 126 enforcement action without reference to whether there's an SIP in place. Right, we believe that the violation of the prohibition referred to in Section 126B exists regardless of where we are in the SIT process. But 126 is very clear that you can do that. Is that your position? Well, our position is that the statute clearly does allow for EPA to – it doesn't place any limits. Let me start here. It doesn't place any limits on when a 126 petition can be submitted. It doesn't place any time limit on when EPA can act on that petition. It just clearly says 60 days after the petition is received and after a hearing. But it does make reference to 110, does it? It does. And as we discussed in our brief, there are two cases that talk about that. And nothing suggests that just because it's linked there that it takes away from the text and the words of the provision. The provision clearly refers to both a violation and a prohibition of Section 110A2D. Now, the fact that it references that only suggests that the substantive prohibition that's in 110A2D should be read as if it's in 126B. But isn't Mr. Bumper's right that you have to wait before – give the state, in this case Pennsylvania, a chance to adopt in this cycle? Nothing in the text of the statute, nothing on its face says that. It simply says that once an EPA has made the finding of significant contribution or interference with attainment, not attainment, then EPA can make that finding. And Section 126C says clear time limits that that source must comply with or it must shut down. So EPA's interpretation gives meaning to those terms. Nothing says that it has to – the Section 126 petition hinges on a set deadline. Well, hold on, Ed. I don't mean to – just because you used the word interpretation. Back to the deference thing. It seems, and your adversary points out that there's been some – maybe the EPA has changed their interpretation. I mean, I'm looking at Federal Register 2856 where it says, it would be difficult to conclude that an affected source in the upwind state emits or would emit in violation of the prohibition of the plan. It is not yet required to contain. And then the footnote says the EPA does not believe Congress intended Section 126 to be used to shorten time frames. Does that seem to contradict what you're saying today? Well, let me start by saying this. These statements are – they're taken from EPA's 1999 rulemaking, which is what we also refer to as the Knox rule. Those statements cannot simply be plucked from that rule and applied here without context. The Knox rule involves several prior related rulemakings and EPA's coordinated response to multiple Section 126 petitions with the Knox SIP call. It is in that particular context that those statements were made, and it is in that particular context that those statements must be viewed. Now, with respect to that statement, EPA was discussing a prior rule where it made a finding that certain action of the states abided by certain action, that it would be sufficient for purposes of eliminating the state's significant contribution. Here EPA has made no finding with respect to some other action that Pennsylvania may take to eliminate Portland's significant contribution. Now, with respect to the time limit, EPA had already determined in that prior rule that if the states had abided by the provisions in the Knox SIP call, that that would eliminate those states' significant contribution as expeditiously as possible. So, therefore, it wouldn't make any sense for EPA to impose a shorter time limit under Section 126B because in that prior rulemaking, it had already determined that the states would do so as expeditiously as practical. Well, I understand what you're saying, but they seem to be painting with a pretty broad brush. Again, footnote one says EPA doesn't believe Congress intended Section 126 to be used to shorten time frames. I mean, that seems like a pretty broad statement. It may seem like that, but again, those statements were made in a totally different context. That Knox SIP rule involved many factual legal issues. It made these statements in that context, and you can't simply take those statements from that rule and apply them here without understanding that context. Is it the case that the EPA can adopt? This is a congressional, I guess, adoption, that 1%. That 1% requirement can be imposed, and the EPA can step in and say, you're violating that 1% requirement, and you must immediately adjust to satisfy the requirements established by the law. I'm sorry, I don't understand. Is it the position of the EPA that you can do that right away, just come in there and say, well, now you've got to change and you've got to take corrective action. We're going to give you 60 days to do it. Can you do that? I mean, I thought Mr. Bumpers is arguing this is really just not fair. We don't have a framework within which to take corrective action, and you're supposed to comply with 110. No, there are many... 110 gives us a framework within which we can work. That's the position your adversary is taking, I believe. There are and there were many other mechanisms available for dealing with a SIP violation, for dealing with the state who did not simply submit a SIP to begin with. What are they? Well, at a time before Section 19, I'm sorry, before Section 126 was even enacted, you have, if a source is violating a SIP requirement, then EPA can use multiple enforcement mechanisms under Section 113. A state or any citizen can implement a citizen suit under Section 304. A state could petition EPA to have a SIP call. If there was no SIP or an inadequate SIP revision, EPA could adopt a FIP. There were multiple options available in these instances where petitioners are claiming that Section 126 should apply, but they would make Section 126 duplicative and redundant, and certainly a cardinal rule of statutory construction compels that interpretations should not be made where it would just simply make a section redundant. Okay, Ms. Peebles, thank you very much. Thank you, Your Honors. Ms. Moceno. May it please the Court, Ruth Musetto for Intervenor-Respondent State of New Jersey. I would like to highlight three points of the State of New Jersey's arguments in my three minutes. Number one, this challenge is not about infringing upon states' rights. The State of New Jersey petitioned EPA for the relief that was granted here. Under Section 126 of the Act, only a state may petition EPA for direct regulation of an upwind source. And as Your Honors are clearly aware, there is no other state in this challenge, including the Commonwealth of Pennsylvania, who in commenting on the rule proposal supported the proposal. Pennsylvania indicated that sulfur dioxide emission reductions at the Portland plant would help its state attain the one-hour sulfur dioxide standard. In addition, Pennsylvania indicated that its citizens would realize public health and environmental benefits as a result of this rule. However, even if this were about infringing upon states' rights, the public health of the citizens in Downwind, New Jersey should trump over Pennsylvania's interest in determining when and how to reduce sulfur dioxide emissions at this Portland plant. Number two, because of the serious circumstances here, Section 126 is very appropriate. The Portland plant began operations in 1958 and since then has had no air pollution controls for sulfur dioxide. It sits within 500 feet of New Jersey's borders. In 2009, it emitted 30,000 tons of sulfur dioxide, which is more than all of New Jersey's power plants combined. This one plant, without contribution from any other plant, is not just significantly contributing to New Jersey's nonattainment, but is causing actual violations of the public health standard, as New Jersey demonstrated in its petition and as EPA independently found. New Jersey is at the mercy of these excessive sulfur dioxide emissions because it cannot directly regulate the Pennsylvania plant. And number three, New Jersey will face serious hardships with the loss of this Portland rule. Without sufficient and specific sulfur dioxide emissions... The question really is whether the EPA is compliant with 126 and whether 126 is linked with 110. And I believe that... We understand that New Jersey's having a serious problem, but we have to look at the statutory provisions. And I think that, as EPA has indicated, that there is authority for EPA to directly act pursuant to 126, particularly in a serious situation here. If New Jersey did not have this rule, New Jersey would only be left with the very long and very expensive sulfur dioxide SIP process. And there is no guarantee that the public health standard violations would be resolved through the SIP process. New Jersey citizens should not have to wait, subject to these public health violations, to find out if Pennsylvania will adequately reduce sulfur dioxide emissions at the Portland plant. Thank you, Ms. Niseto. Thank you very much. Mr. Fabich? May it please the Court. My name is Zach Fabich, and I'm here on behalf of Respondent Intervenors Clean Air Council, Greenpeace, and the Sierra Club. I'd like to make two quick points, first concerning Section 126 and Section 110. Section 126 incorporates Section 110A2D1's prohibition against interstate pollution that causes or threatens nonattainment. Section 126, however, does not direct EPA to find whether or not the source is violating a SIP or whether or not an existing state SIP is adequate. Instead, what 126 does is it sets up a substantive prohibition against interstate pollution that prevents or threatens attainment. As a second point, the purpose of Section 126 is to put states on more even footing as regarding interstate pollution. 126 gives downwind states a tool to compel EPA to address interstate pollution and to speed up the process by which a downwind state can get relief from upwind sources of pollution. However, GenOn is advocating a position that would revert to the pre-126 situation in which a downwind state is entirely beholden to the upwind state's progress through its SIP process. As Counsel for New Jersey just mentioned, Portland is here all by itself preventing attainment of the NAAQS in New Jersey. New Jersey could shut down all of its industry in the affected areas and still be unable to come up with a plan to comply with the NAAQS. In the meantime, in the impacted areas, tens of thousands of adults and children with asthma and a quarter million individuals with cardiovascular disease would suffer from unhealthy air. There's nothing in the plain language of 126 that requires the petitioning state to wait and see whether the upwind state stops sending pollution over the border during the SIP process before it can file its petition. Thank you. Was there any discussion about 126 being an emergent measure that has to be adopted, employed immediately? I mean, is there anything in the congressional background that suggests that this is something that states can use promptly, immediately for corrective action? At the time 126 was passed, Congress was concerned with the issue of interstate pollution languishing. It was brought to speed up this process. Okay. I mean, one thought is that it should be linked to 110, and then 110, of course, is a framework, it's a process, and it does take time. 126, I'm wondering if there was any congressional record that suggests that this is a measure that should be used immediately for corrective action. No, 126, as written, does not refer to the SIP timelines. It doesn't say that. Thank you very much. Thank you. Your Honor, a couple of things. One is, I'd like to just point back, Ms. Peoples went through the NOC SIP call in all of the language throughout that rulemaking that is replete, that frankly supports our interpretation of 126. And she points out that when there is a violation, the states have numerous options. They can file a petition under 126. They can bring a citizen action under 304. They can sue EPA for action under Section 307. All of those things are available to the states after there's been a violation or a failure of the states. I think it's real important, your last question, Your Honor, is, is there anything in the legislative history that says this is an emergency remediation measure? And the answer is, quite the contrary. When 126 was adopted, Congress made very clear that this was to address long-term failures of state action and to resolve conflicts between the states. Those conflicts can't arise when the states have not been given their opportunity to act in accordance with the 110 process. Here, New Jersey hasn't filed its SIP yet. So they're asking Pennsylvania and the gen on source to reduce its emissions before they even have an opportunity or an obligation to address their own emissions. True, New Jersey has lower emissions. That is beside the point in this case. We're not talking about the facts issue. We're talking about the legal framework. The final point, and I think this is really critical, throughout the Clean Air Act, Congress has covetously protected the states' prerogatives. When Congress wants to give EPA authority or limits of authority, it does it expressly. It does not, in an ancillary position or provision, countermand what is expressly prohibited in section 110. Well, Appalachian Power is against that. Doesn't that go against your argument right now? I don't think it does, Your Honor, because again, in Appalachian Power, the states had gone through that process. They had developed and submitted their SIPs. They'd been operating under it. And EPA, years later, had made a determination and actually acted under section 110, as it's supposed to, under 110K, to say, you've got to change your SIPs. At that point, it is entirely appropriate if the states want to come in and say, amending their SIPs is not good enough. That's going to take more time. You've made a finding that there's a violation of the prohibition because their SIPs failed. Act under 126. And indeed, in the not SIP call in 126, which were put out together, they could have done exactly that. Congress could have, or EPA could have imposed much more rigorous emission reductions under 126 at that point. But they elected not to because they had a much broader regulatory program they were hoping to implement. So all I say is, Your Honor, we would ask you not to find the elephant in the 126 mouth hole. Thank you. Thank you, Mr. Buffers. Thanks to everyone for the very helpful arguments. We'll take the case under advisement, and we'll adjourn.